SUMMARY MEMORANDUM AND OPINION; NOT INTENDED FOR PUBLICATION

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **PARSHOTAM CHAHIL**, <br><br> Plaintiff, <br><br> v. <br><br> **EPISCOPAL CHURCH HOME FRIENDSHIP, INC. t/a FRIENDSHIP TERRACE RETIREMENT HOME,** <br><br> Defendant. | Civil Action No. 10-cv-418 (RLW) |

**MEMORANDUM OPINION**[1]

This matter is before the Court on Defendant Episcopal Church Home Friendship, Inc. t/a

Friendship Terrace Retirement Home's ("FTR") Motion for Summary Judgment.  (Dkt. No. 17).

Plaintiff Parshotam Chahil ("Chahil"), a tenant of FTR, is a blind man of Indian descent and the

Sikh faith.  Chahil asserts six counts against FTR:

- Count I:  That FTR discriminated against Chahil based on his blindness and failed to accommodate him under the Fair Housing Act ("FHA") and the District of Columbia Human Rights Act ("DCHRA") with regard to his evening meal program;

- Count II:  That FTR discriminated against Chahil based on his race, national origin and religion under the FHA and DCHRA by failing to accommodate his dietary needs and exempt him from the evening meal program;

---

[1]     This unpublished memorandum opinion is intended solely to inform the parties and any reviewing court of the basis for the instant ruling, or alternatively, to assist in any potential future analysis of the *res judicata*, law of the case, or preclusive effect of the ruling.  The Court has designated this opinion as "not intended for publication," but this Court cannot prevent or prohibit the publication of this opinion in the various and sundry electronic and legal databases (as it is a public document), and this Court cannot prevent or prohibit the citation of this opinion by counsel.  Cf. Fed. R. App. P. 32.1.  Nonetheless, as stated in the operational handbook adopted by our Court of Appeals, "counsel are reminded that the Court's decision to issue an unpublished disposition means that the Court sees no precedential value in that disposition." D.C. Circuit Handbook of Practice and Internal Procedures 43 (2011).

SUMMARY MEMORANDUM AND OPINION; NOT INTENDED FOR PUBLICATION

- Count III: That FTR discriminated against Chahil based on his blindness in violation of the FHA and DCHRA with regard to informational notices;

- Count IV: That FTR breached its lease with Chahil by failing to modify his rental rates in accordance with HUD regulations;

- Count V: That FTR breached the anti-discrimination clause of its lease with Chahil; and

- Count VI: That FTR is liable to Chahil for common law defamation/libel.

For the following reasons, FTR's Motion is **GRANTED IN PART** and **DENIED IN PART**. For purposes of this ruling, the Court will assume the reader is familiar with the factual assertions and arguments that the parties have made, and will not recite those again here.[2]

## ANALYSIS

### A. Standard of Review

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Moore v. Hartman, 571 F.3d 62, 66 (D.C. Cir. 2009) (citing FED. R. CIV. P. 56(c) and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)). The "function of the court on a summary judgment motion is limited to ascertaining whether any factual issue pertinent to the controversy exists; it does not extend to resolution of any such issue." Weiss v. Kay Jewelry Stores, Inc., 470 F.2d 1259, 1261-62 (D.C. Cir. 1972) (internal citation and quotation marks omitted). A genuine issue of material fact exists if the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. A party, however, must provide more than "a scintilla of evidence" in support of its position; the quantum of evidence must be such that a jury could

---

[2]    Pursuant to Local Civil Rule 7.1(h), in "determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." Accordingly, unless otherwise noted, the Court states only uncontroverted facts.

reasonably find for the moving party.  Id. at 252.  In considering a motion for summary

judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to

be drawn in his favor."  Id. at 255.

### B. Count One: Discrimination and Failure to Accommodate Under the FHA And DCHRA Based On Disability (Blindness) With Regard To Mandatory Meal Program.

Chahil alleges that FTR unlawfully discriminated against him and failed to accommodate

his blindness with regard to the mandatory evening meal program.  (Compl. at ¶¶ 22-25).  Chahil

contends that FTR: 1) refused to read him the menu; 2) refused to provide appropriate utensils;

3) failed to inform him how to file a complaint about the food; 4) failed to accommodate his

request to be exempted from the food program; and 5) failed to accommodate his dietary needs.

(Id.).  Because there is a genuine dispute of material fact, summary judgment is denied as to

Count I.

### 1. FHA and DCHRA

Under the FHA, it is unlawful "[t]o discriminate against any person in the terms,

conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities

in connection with such dwelling, because of [the person's] handicap."  42 U.S.C. § 3604(f)(2);

Geter v. Horning Bros. Mgmt, 537 F. Supp. 2d 206, 209 (D.D.C. 2008).  "Discrimination

includes 'a refusal to make reasonable accommodations in rules, policies, practices, or services,

when such accommodations may be necessary to afford such person equal opportunity to use and

enjoy a dwelling.'"  Id. (quoting 42 U.S.C. § 3604(f)(3)(B)).  To succeed on a failure to

accommodate claim under the FHA, a plaintiff must show:

> 1) He suffers from a handicap as defined by the [FHA]; 2)
> defendants knew or reasonably should have known of the
> plaintiff's handicap; 3) accommodation of the handicap 'may be
> necessary' to afford plaintiff an equal opportunity to use and enjoy

the dwelling; and 4) defendants refused to make such accommodation.

Id. (citing Giebeler v. M & B Assocs., 343 F.3d 1143, 1147 (9th Cir. 2003)). According to the District of Columbia Court of Appeals, a landlord may only be held liable for a failure to accommodate if the landlord knew or should have known the tenant suffered from a handicap, as recognized by the FHA. Douglas v. Kriegsfeld Corp., 849 A.2d 951, 992 (D.C. 2004) (opinion superseded on other grounds by Douglas v. Kriegsfeld Corp., 884 A.2d 1109 (D.C. 2005)). Once a landlord is made aware of a needed accommodation, both parties must participate in an interactive process of good faith communications to identify the limitation resulting from the disability and a reasonable accommodation. Bartee v. Michelin North America, Inc., 374 F.3d 906, 916 (10th Cir. 2004) (citing Smith v. Midland Brake Inc., 180 F.3d 1154, 1171 (10th Cir. 1999)). It is not, however, sufficient for the tenant to show that the landlord failed to engage in an interactive process or that it caused the interactive process to break down. See Pantazes v. Jackson, 366 F. Supp. 2d 57, 70 (D.D.C. 2005) (internal citations omitted). The tenant must show that the result of the inadequate process was the failure of the landlord to fulfill its role in determining a reasonable accommodation. Id. Once the process has begun, both the employer and employee have a duty to act in good faith, "and the absence of good faith, including unreasonable delays caused by an employer, can serve as evidence" of a violation. Id. (emphasis added); see also Douglas, 884 A.2d at 1122-23 & n.23 (stating that any undue delay in responding to a tenant's request for a reasonable accommodation may itself constitute a failure to accommodate).

For purposes of this analysis, the relevant provisions of the FHA and the DCHRA will be construed under the same standards as the Americans with Disabilities Act (ADA) with regard to comparable sections of these statutes. The District of Columbia Court of Appeals has held:

4

> When courts apply the reasonable accommodation provision of the Fair Housing Act, it is their established practice to rely on the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101, 12102, and the Rehabilitation Act (RA), 29 U.S.C. § 794, both of which mandate an interactive process through which employers and employees explore what accommodations are reasonable. See 29 C.F.R. § 1630.2(o)(3) (1995); 29 C.F.R. pt. 1630 Appendix (1996); 29 U.S.C. § 794(d); Giebeler [v. M& B Assocs.], 343 F.3d [1143] at 1156-57 [9th Cir. 2003] (stating that court ordinarily applies RA case law in applying reasonable accommodation provisions of Fair Housing Act and also generally applies RA and ADA case law "interchangeably"; Good Shepherd Manor Found., Inc. v. City of Momence, 323 F.3d 557, 561 (7th Cir. 2003).

Douglas, 884 A.2d at 1122, n.22.

Moreover, discrimination claims under the FHA and DCHRA are assessed pursuant to the familiar three-step framework set forth in McDonnell Douglas Corp. v. Green. See 411 U.S. 792 (1973); Gaujacq v. EDF, Inc., 601 F.3d 565, 576 (D.C. Cir. 2010); Neithamer v. Brenneman Property Services, Inc., 81 F. Supp. 2d 1, 3 (D.D.C. 1999). As this Circuit has held,

> In Brady v. Office of Sergeant at Arms, 520 F.3d 490 (D.C. Cir. 2008), we made it clear that when 'an employer has asserted a legitimate, non-discriminatory reason' for an alleged adverse action, the District Court need only 'resolve one central question' when considering a motion for summary judgment: 'Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex or national origin?'

Gaujacq, 601 F.3d at 576 (quoting Brady, 520 F.3d at 494).

### 2. Summary Judgment is Not Proper on Count I

Chahil lodges numerous complaints in support of his claim that FTR failed to accommodate his blindness as to the mandatory meal program. The Court will not address and resolve each and every allegation here. It is enough, however, that there are genuine disputes of material fact as to whether an exemption from the meal program was necessary to afford Chahil

equal opportunity to use and enjoy his residence and whether FTR engaged in an interactive process to determine a reasonable accommodation. Moreover, as set forth in the discussion regarding Count II, there is a genuine dispute regarding whether FTR discriminated against Chahil by its failure to follow its own process for resolving requests for exemptions from the mandatory meal program. Accordingly, FTR's Motion is denied as to Count I.

Chahil claims that, after a series of stressful events in the FTR dining room, he decided to stop participating in the mandatory meal program in March of 2007. (Dkt. No. 17-2 at ¶ 38-41). On April 8, 2007, Chahil wrote to FTR's Administrator Dawn Quattlebaum explaining his reasons: "[d]innertime was often a nightmare made worse by my blindness. For independent living, self-service eliminates the need for menu, table service, room service, etc. Removing a constant and unnecessary source of stress, thank you." (Dkt. No. 17-2 at ¶ 44). On July 6, 2007, Chahil submitted a letter from his physician Dr. Dennis Murphy. (Id. at ¶ 45). Dr. Murphy requested that FTR exempt Chahil from the meal program, "and that he be allowed to choose to eat either communally or on his own. His blindness makes it much more difficult for him to keep the dining schedules, etc." (Id. at ¶ 45).

It appears that the only steps FTR took regarding Chahil's request was to have Joseph Brady, the General Manager of FTR's food service provider Sodexho, reach out to Chahil to offer in-room tray service to reduce the anxiety Chahil had experienced in the cafeteria. (Id. at ¶¶ 50-54). Chahil refused the tray service (id. at ¶ 55), stating later that it would neither resolve his concern that the Food Service could not meet his dietary needs nor save him the stress of dealing with the staff from the food service. (Id. at ¶ 55).

k.FTR argues that it is entitled to summary judgment on Count I because Chahil cannot show that he was required an exemption from the program based specifically on his blindness.

SUMMARY MEMORANDUM AND OPINION; NOT INTENDED FOR PUBLICATION

Against its own procedure, however, FTR failed to contact Dr. Murphy to discuss whether in-room tray service would be an acceptable alternative to an exemption.  Moreover, Chahil testified that in-room service would not be a reasonable accommodation for his blindness because the stress of dealing with FTR staff, including the invasion of privacy, would not be alleviated by in-room service.  (Dkt. No. 18-7 at 190:11-16; 93:12-94:4; 98:8-20; Dkt. No. 18-8 at 190:11-16).  Specifically, Chahil required a staff member to read the dinner menu to him, and Chahil testified that he had had issues with FTR staff in the past.  (Dkt. No. 18-7 at 92:21-93:1; Dkt. No. 18-8 at 160:22-161:4; 164:1-166:16).  Relying on Dr. Murphy's testimony, FTR argues that the exemption was not a necessary accommodation for Chahil's blindness:

> Q.  Are you aware of any reason Dr. Chahil's blindness would prohibit him from participating in the evening meal program if he chose to, if he wanted to?
>
> A.  I don't know what – I don't know what exactly what it entails in terms of as long as he was able to know what the menu entailed every day and had a pretty good understanding of everything and the options and help if he needed it then I think he would be on board with that and would be able to participate.

(Dkt. No. 17-2 at ¶ 46).  Dr. Murphy's testimony, however, is not nearly as conclusive as FTR characterizes it.  Dr. Murphy did not testify that the accommodation that FTR offered—in-room tray service—would be reasonable for Chahil.  Moreover, Dr. Murphy stated that (at least with regard to Chahil's blindness), the meal program might be appropriate only if the staff informed Chahil "what the menu entailed every day and [Chahil] had a pretty good understanding of everything" and Chahil got "help if he needed it."  (Id.).  As stated above, there is a dispute as to whether FTR's staff could provide Chahil the help he needed, especially with regard to reading the menu.

It is true that a tenant is not entitled to each and every accommodation that he prefers, and the evidence for Chahil on Count I is somewhat weak.  Although it is a close call whether Chahil required an exemption from the in-room tray service as a reasonable accommodation for his blindness, however, this is not a question the Court can resolve on summary judgment.  Accordingly, FTR's Motion is denied as to Count I.

### C. Count II: Race, National Origin and Religious Discrimination Under FHA and DCHRA With Regard To Mandatory Meal Program.

Chahil next claims that FTR discriminated against and failed to accommodate him with regard to the meal program based on his race, national origin and religion.  (Compl. at ¶¶ 30-38).  Chahil claims that, because he is an Indian man of the Sikh faith, he was denied an exemption from the Mandatory Meal Program and that FTR failed to accommodate Chahil's dietary needs.  (Id. at ¶¶ 31-34).  FTR contends that it undertook an interactive process to determine whether it could accommodate Chahil's dietary needs and that denied his exemption request because it could accommodate his needs.  FTR has failed to show that it is entitled to summary judgment on this count.

Since Chahil moved into FTR in 2006, he has been one of only three blind residents and the only resident of Indian descent or of the Sikh faith.  (Dkt. No. 17-2 at ¶¶ 19, 20).  Because he is Sikh, Chahil maintains a beard and wears a turban.  (Dkt. No. 18-8 at 276:7-10).  HUD regulations require that FTR residents participate in an evening meal plan, but that a resident may be exempted "if the resident's dietary needs cannot be accommodated by Food Services . . . ."  (Dkt. No. 17-2 at ¶¶ 3, 13).  Quattlebaum testified that FTR required any resident requesting an exemption from the meal plan for medical or dietary needs to provide a physician's letter.  (Id. at ¶ 14).  After receiving such a letter, Quattlebaum would normally have the staff nurse and

SUMMARY MEMORANDUM AND OPINION; NOT INTENDED FOR PUBLICATION

Sodexho review the physician's letter to determine whether or not the diet could be accommodated. (Dkt. No. 18-5 at 28:9-14). Joseph Brady also testified regarding this process:

> Dawn would make the decision, she would get my opinion on if I could supply the foods that the person needed, and she would also consult the nurse practitioner on the medical end of the situation. Then she would make the decision on whether they got excused from the meal plan or not.

(Dkt. No. 18-16 at 30:16-21).

It is undisputed that Chahil participated in the meal plan for the first ten months that he lived at FTR. (Dkt. Nos. 17-2 and 21 at ¶ 24). As part of his request for an exemption from the meal plan, Chahil submitted the letter from Dr. Murphy on or around July 6, 2007. (Dkt. No. 17-2 at ¶ 45). That letter stated, among other things, that Chahil required a "fairly rigid low-fat diet, consisting largely of fruits and vegetables. Unfortunately, in his eating arrangement at [FTR] it has been almost impossible for him to adhere to this diet, which is a concern for me." (Id.) (emphasis added).

Quattlebaum did not acknowledge receipt of Chahil's physician's letter until approximately a month later on August 6, 2007. (Dkt. No. 17-2 at ¶ 48). In that letter, Quattlebaum told Chahil that the process for resolving his request could take "more than one week." (Id. at ¶ 49). Quattlebaum also wrote:

> I wanted to inform you of our process for these types of requests. Our Nurse Practitioner, Gail Bashore, will receive a copy of this request this Thursday, August 9, 2007. She will contact you to discuss this matter, contact your physician, and discuss this request with our Food Service Director, Joe Brady. Ms. Bashore will then make a determination as to whether or not your medical conditions can be accommodated by our foodservice program and submit that information to me.

(Dkt. No. 18-12).

Quattlebaum did not notify Brady about Chahil's request until the end of September. (Dkt. No. 17-2 at ¶ 50). Brady informed Quattlebaum that he had spoken to Chahil, that Chahil required a vegetarian diet, and that Food Services could accommodate Chahil's dietary needs. (Id. at ¶¶ 56-57). Based solely on Brady's opinion, Quattlebaum denied Chahil's request for an exemption. (Id. at ¶ 58; Dkt. No. 17-3 at 42:2-5; Dkt. No. 18-5 at 36:14-37:11).

Despite testifying that her procedure was to have the nurse and Food Services review any physician's letter, Quattlebaum testified that she never discussed Chahil's request with Sodexho's nutritionist and could not recall whether she ever discussed the request with FTR's Nurse Practitioner, Gail Bashore. (Dkt. No. 18-5 at 35:18-37:11). Moreover, Quattlebaum did not know what steps, if any, Bashore took with respect to Chahil's request. (Id.). Brady himself testified that he neither consulted with the FTR nurse nor with the nutritionist regarding Chahil's request. (Id. at 18-16 at 30:7-10; 75:6-10). Despite Dr. Murphy's letter that Chahil required a "fairly rigid low-fat diet," Brady also failed to look into the calorie or fat content of the meals that were being served before giving Quattlebaum his recommendation. (Dkt. No. 18-16 at 45:13-46:6).

It was not until approximately a year later on August 28, 2008, that Quattlebaum notified Chahil that "she had denied his exemption request after Brady told her Chahil's diet of fruits and vegetables could be accommodated by Food Services." (Dkt. No. 17-2 at ¶¶ 60-61). Although Quattlebaum was FTR's Administrator and was responsible for deciding whether or not to grant resident requests for exemptions, she did not contact Chahil prior to August 2008 because she believed that Brady had already communicated to Chahil that Chahil would not be receiving an exemption. (Dkt. No. 17-2 at ¶¶ 11-12; 59).

SUMMARY MEMORANDUM AND OPINION; NOT INTENDED FOR PUBLICATION

In July 2009, FTR changed management, at which time Jennifer Easter ("Easter") acquired many of Quattlebaum's responsibilities.  (Dkt. No. 17-1 at 12).  In November 2009, Easter was made aware of Chahil's request for an exemption by way of his Charge of Discrimination from the D.C. Office of Human Rights.  (Id.).  Easter approved Chahil's exemption request on January 27, 2010 pursuant to a HUD regulation that permits a discretionary exemption from the Mandatory Meal Program for good cause.  (Id.).

Given this record, the Court cannot grant summary judgment in FTR's favor on Count II. It appears undisputed that Quattlebaum failed to follow FTR's own process for determining whether Chahil should be exempt for medical reasons.  Neither she nor Brady (or anyone else at FTR it seems) consulted with Dr. Murphy or another medical professional to determine what specific diet Chahil required.  Although Brady supposedly spoke to Chahil and determined that Food Services could accommodate his diet merely because Food Services served fruits and vegetables, Dr. Murphy had already rejected FTR's menu as inappropriate for Chahil's diet.  See Dkt. No. 17-2 at ¶ 45 ("Unfortunately, in [Chahil's] eating arrangement at [FTR] it has been almost impossible for him to adhere to this diet, which is a concern for me.").  There is a genuine dispute of material fact as to whether FTR could accommodate Chahil's diet at the time that Quattlebaum denied Chahil an exemption.

Although there is no direct evidence of discrimination and the circumstantial evidence is somewhat weak, given FTR's near 14-month delay alone in acting upon Chahil's request and Quattlebaum's apparent disregard for her own process when it came to Chahil's request, the Court cannot say that FTR is entitled to judgment as a matter of law on Chahil's claim of discrimination.  Finally, FTR's claim that Quattlebaum also denied exemption requests made by other similarly-situated tenants outside Chahil's protected class is not enough to warrant

summary judgment in FTR's favor.  Quattlebaum's testimony as to other tenants for whom she either granted or denied exemptions is neutral at best, given that Quattlebaum could not recall details of most or all of the circumstances surrounding such requests.  (Dkt. No. 17-3 at 50:2-61:17).  Accordingly, FTR's motion as to Count II is denied.

**D. Count III: Disability Discrimination under FHA and DCHRA Act with Regard to Informational Notices.**

Chahil alleges that FTR discriminated against him with regard to informational notices posted throughout the apartment building.  (Dkt. No. 18-2 at 18-19).  Chahil claims that, because he is blind, he was unable to see the notices and FTR failed to provide "effective notifications of meetings, notices and the like."  (Compl. at ¶ 41).  Based on the facts set forth in Paragraphs 71-79 of FTR's Statement of Undisputed Facts in Support of Summary Judgment, Chahil has failed to make a prima facie case of discrimination with respect to the informational notices.  (Dkt. No. 17-2 at ¶¶ 71-79; Dkt. No. 21 at ¶¶ 71-79).  FTR has shown that Chahil never requested a different accommodation than the procedure FTR had in place.  Therefore, FTR did not refuse to make a requested accommodation.  Even assuming FTR had refused Chahil's requested accommodation, FTR has shown that it provided a reasonable alternative to accommodate Chahil's needs.  Accordingly, summary judgment is granted on Count III.

**E. Count IV:  Breach of Contract With Regard to Rental Rates.**

Although the basis for and legal theory as to Count IV is unclear, it appears that Chahil is alleging that FTR breached its lease with him by failing to reduce his rental rates in "accordance with HUD regulations."  (Dkt. No. 18-2 at 20).  In his Complaint, Chahil alleges that FTR "modified plaintiff's rental in March 2009 in accordance with HUD regulations.  However, the defendant breached the express provisions of the lease and is in breach of contract because (on information and belief) the rent should have been modified earlier in the least [sic] term."

(Compl. at ¶ 47).   In his Opposition to FTR's Motion for Summary Judgment, Chahil argues that, although FTR offered him a lease with a reduced rental rate, Chahil "refused to execute the new rental contract with the reduced rental rate because FTR continued to wrongfully charge him the $260 fee for the evening meal program."  (Dkt. No. 18-2 at 19).

Chahil offers no support for his claim that he can recover on a breach of contract action for the reduced rental rates when he refused to sign a lease with those rates.  See Tsintolas Realty Co. v. Mendez, 984 A.2d 181, 187 (D.C. 2009) (stating that, to prevail on a breach of contract claim under District of Columbia law, a plaintiff must prove the defendant breached a duty arising out of a valid contract between the parties).  Nor does Chahil cite to any legal authority or specific HUD regulation for the proposition that he was entitled to such a lease modification. Accordingly, given that there is no genuine dispute and FTR is entitled to judgment as a matter of law, FTR's motion is granted as to Count IV.

**F.  Count V: Breach of Lease With Regard To Anti-Discrimination Clause.**

Chahil asserts that FTR breached its original lease between the parties, specifically clause seventeen: "The Landlord agrees not to discriminate based on race, color, religion, creed, national origin, sex, age, handicap, membership in a class, or recipients of public assistance," when FTR failed to provide Chahil with a suitable apartment with all the amenities afforded to other residents.  (Compl. at ¶52; Dkt. 18-6 at ¶ 17).

The Complaint is unclear what specific facts Chahil relies on to assert a breach of the anti-discrimination clause of the lease.  FTR argues that, because Chahil could not show discrimination as to Counts I, II, and III, Chahil cannot show that FTR breached its duty arising out of paragraph 17 of the lease.  Because there is a genuine dispute as to whether FTR

discriminated against Chahil with respect to Counts I and II, however, FTR is not entitled to summary judgment on Count V and its Motion is denied as to this count.

### G. Count VI: Common law Defamation/Libel.

FTR's Motion will, however, be granted respect to Chahil's common law defamation/libel claim in Count VI.  To prevail on a defamation claim under District of Columbia law, a plaintiff must show:

> 1) that the defendant made a false and defamatory statement concerning the plaintiff; 2) that the defendant published the statement without privilege to a third party; 3) that the defendant's fault in publishing the statement amounted to at least negligence; and 4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 858 (D.C. Cir. 2006).  In a defamation claim, "the plaintiff has the burden of proving that the challenged statements are both false and defamatory."  Kendrick v. Fox Television, 659 A.2d 814, 819 (D.C. 1995).  Further, "[a] defamatory statement is one that 'tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community.'"  Id. (quoting Moss v. Stockard, 580 A.2d 1011, 1023 (D.C. 1993)).  The tort of defamation requires publication to a third party; no actionable claim would arise from a statement published only to the plaintiff, the object of the allegedly defamatory statement.  Oparaugo v. Watts, 884 A.2d 63, 73 (D.C. 2005). In a defamation case, "the plaintiff has the burden of proving that the challenged statements are both false and defamatory."  Kendrick, 659 A.2d at 819.

Chahil claims that Quattlebaum made a false and defamatory statement in her August 28, 2008 letter when she wrote that the process of resolving Chahil's complaints "was delayed a bit because Mr. Brady had difficulty getting in contact with [Chahil]."  (Compl. at ¶ 56).  Chahil

SUMMARY MEMORANDUM AND OPINION; NOT INTENDED FOR PUBLICATION

claims that this particular statement was "clearly false" and that he was "compromised" "personally, professionally and as a resident." (Id. at ¶ 60).

Chahil does not dispute, however, that Brady tried to call him "three or four times" on three different days to talk to him about his dietary needs. (Dkt. Nos. 17-2 and 21 at ¶ 52). Nor does Chahil dispute that it "took Brady somewhere from a week to a 'month or two' to reach Chahil by phone." (Dkt. Nos. 17-2 and 21 at ¶ 53). It is further undisputed that the letter from Quattlebaum to Chahil was: 1) placed in Chahil's tenant file in a locked cabinet; 2) that Chahil does not know who received the letter; and 3) that Quattlebaum is not aware that anyone besides Chahil and herself has seen the letter. (Dkt. Nos. 17-2 and 21 at ¶¶ 62-64). Finally, there is no genuine dispute that Chahil lacks evidence of any damage flowing from the alleged defamatory statement. (Compare Dkt. No. 17-2 at ¶ 65 with Dkt. No. 21 at ¶ 65). Because there is no genuine dispute as to the veracity of the alleged defamatory statement, no evidence that the statement was published to a third party, and no evidence that Chahil suffered actionable damages, summary judgment is granted to FTR on Count VI.

## CONCLUSION

For the foregoing reasons, FTR's Motion is **GRANTED IN PART** and **DENIED IN PART**. An Order accompanies this Memorandum.


Date:   September 7, 2012

                                                    _____
                                                    ROBERT L. WILKINS
                                                    United States District Judge